UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DENNIS COOK,                    :        Civil Action No. C-1-02-073

            Plaintiff,          :        (Judge Weber)

vs.                             :        **JOINT FINAL PRETRIAL ORDER**

CITY OF NORWOOD, et al.,        :

            Defendants.         :


This matter is before the Court pursuant to Rule 16 of the Federal Rules of Civil

Procedure.

I.    <u>**APPEARANCES**</u>

        For Plaintiff:      Robert G. Kelly
                            4353 Montgomery Road
                            Norwood, Ohio 45212

        For Defendants:     Lawrence E. Barbiere, Esq.
                            Michael E. Maundrell, Esq.
                            Schroeder, Maundrell, Barbiere & Powers
                            Attorney for Defendant City of Norwood
                            11935 Mason Road, Suite 110
                            Cincinnati, Ohio 45249-3703

                            W. McGregor Dixon, Jr., Esq.
                            Shipman, Dixon & Livingston
                            Attorney for Defendant Joseph J. Hochbein
                            215 West Water Street
                            Troy, Ohio 45373

                            Steven C. Martin, Esq.
                            Ziegler & Schneider
                            Attorney for Defendant Gary Hubbard
                            541 Buttermilk Pike, Suite 500
                            Covington, Kentucky 41017-5710

James F. Brockman, Esq.
Edward Roberts, Esq.
Lindhorst & Dreidame
Attorney for Defendant Kevin Cross
312 Walnut Street, Suite 2300
Cincinnati, OH  45202

## II.    NATURE OF ACTION AND JURISDICTION

A.    This is an action for discrimination due to disability pursuant to federal and state law.

B.    The jurisdiction of the Court is invoked under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12112, 28 U.S.C. §1331 and 42 USC 12101-12213.

C.    The jurisdiction of the Court is disputed by Defendants insofar as Plaintiff's Charge of Discrimination was not timely filed with the Equal Employment Opportunity Commission ("EEOC").  Because the administrative prerequisite of a timely filed charge was not met, this Court does not have jurisdiction over Plaintiff's ADA claim.  Further, upon dismissal of Plaintiff's federal claim, Plaintiff's supplemental state claim should be dismissed.

D.    Plaintiff has appealed the Court's Order on Summary Judgment to the 6th Circuit Court of Appeals and a conference with the Court is scheduled for May 11, 2004.  It is the position of Norwood that the appeal should be dismissed.

## III.    TRIAL INFORMATION

A.    The estimated length of trial is 8 to 10 days.

B.    Trial to a jury will begin on _____.

## IV.    STATEMENT OF THE CASE

Plaintiff claims:

Plaintiff claims the Defendants discriminated against the Plaintiff because of his disability by demotion of the Plaintiff from leadman to street sweeper because of his disability, demoted the Plaintiff from street sweeper to laborer because of his disability, refused to permit the Plaintiff to work because of his disability and Defendants engaged in a course of conduct, i.e, stalking employees with disabilities  while on the job and writing fictitious disciplinary charges against employees with disabilities, suspending employees with disabilities without a hearing, denying employees with disabilities the use of bathroom facilities, water and requiring employees with disabilities to endure the

humiliation of using the public radio to transmit requests to use the bathroom, denying employees with disabilities the seniority right to bump less senior men in the selection of work assignments and assigning employees with disabilities to the least desirable job assignments, denying employees with disabilities vacation that was earned or granting the vacation but not advising the employees with disabilities of the approval of the vacation until after the employees with disabilities reported for work or advising the employee after he worked that the vacation was approved, permitting and encouraging employees to threaten employees with disabilities with physical violence, including death threats, and taking no action to stop the threats of violence in the work place and disciplining employees with disabilities who reported acts of physical violence and death threats, thereby encouraging and condoning the continued threats of violence against employees with disabilities to intimidate them to resign their position, permitting employees to use profanity, vulgarities and demeaning name calling on a daily basis at the workplace with impunity towards employees with disabilities and thereby creating a hostile work environment for employees with disabilities to force them to resign, imposing disparate discipline for employees with disabilities as compared to non disabled employees, harassing employees with disabilities by requiring them to undergo medical and psychological examinations without just cause, refusing to permit employees with disabilities to work at their regularly assigned jobs by the issuance of notices that the individual is unable to work or has been fired, and taking disciplinary action against employees with disabilities who filed workers compensation claims, issuing letters of termination to employees with disabilities without justification and then alleging that the letters were sent in error, routinely denying employees with disabilities workers compensation claims while approving the same or similar claims of other employees, denying employees with disabilities safety equipment required by the City's safety policy and then imposing disciplinary action for the employees with disabilities failure to have the proper safety equipment, retaliating and intimidating employees with disabilities or taking job actions against employees with disabilities who filed complaints with the Equal Employment Opportunity Commission, denying employees with disabilities compensation for on duty injuries as required by law; failure to pay employees with disabilities compensation earned and theft of wages of older employees, creation of job assignments and equipment designed to demean and embarrass employees with disabilities, hiring employees with criminal records to harass and intimidate employees with disabilities with death threats or physical injury; taunting employees with disabilities for their religious beliefs, taunting employees with disabilities with racial slurs and sexual remarks, Defendants' actions aforesaid and as stated in this complaint were done purposefully, maliciously and intentionally with malice aforethought with the purpose of harming the Plaintiff.

Plaintiff further alleges the Defendants eliminated any means of the Plaintiff to contest the Defendants actions through any disciplinary process by the actions of the Defendants in the creation of a meaningless hearing process which was rigged to penalize the Plaintiff for all write ups by the Defendants.

<u>Defendants claim:</u>

This is a discrimination action filed by Plaintiff Dennis J. Cook pursuant to the ADA and Ohio's discrimination statute against Defendants: City of Norwood, his former employer; Joseph J. Hochbein, the former Mayor of Norwood, in his individual and representative capacities; and Kevin Cross and Gary Hubbard, his former supervisors, in their individual and representative capacities. The defendants deny that they discriminated against plaintiff in any way and further deny that they are in any way liable to plaintiff. They acted toward plaintiff in a reasonable manner and made every effort to respond to his frequent complaints and grievances. Plaintiff left the employment of the City of Norwood voluntarily as a result of physical and emotional disabilities which he recognized rendered him unable to do his job. The defendants deny that their actions caused plaintiff any damages whatsoever.

**V.     TRIAL DETERMINATIONS**

    A.     **FACTS**

       1.     **Stipulated Facts:**

The parties stipulate as to the following facts:

> Plaintiff began his employment with the City of Norwood on January 16, 1975.

> Plaintiff has a bipolar disorder.

> Plaintiff supported the election of Defendant Hochbein as Mayor of the City of Norwood.

> Defendant Hochbein's first term as Mayor of the City of Norwood began January 1, 1996.

> Defendant Hochbein hired Defendant Hubbard for the position of Director of Public Service.

> Defendant Hubbard began in the position of Director of Public Service in February 1996.

> Defendant Hochbein hired Defendant Cross for the position of Superintendent of Public Works.

> Defendant Cross served as the Superintendent of Public Works from February 17, 1996 to January 1, 2002.

On or about May 12, 1999, Plaintiff injured his neck while operating a weed eater.

Plaintiff filed a claim on May 12, 1999 with the Bureau of Workers' Compensation ("BWC") for "cervical strain" arising out of his neck injury.

Plaintiff filed a Complaint in state court against the BWC and the City of Norwood challenging the rejection of his "severe depression" and "bipolar disorder".

On July 16, 1999, Plaintiff applied to the Ohio Public Employees Retirement System ("PERS") for a determination that he was permanently disabled due to his physical condition, which was set forth as "neck-back-shoulder-low back."

On October 25, 1999, PERS rejected Plaintiff's application for permanent disability based on his physical condition.

On February 23, 2000, PERS approved Plaintiff's application for permanent disability based on his mental condition.

The determination by PERS that Plaintiff was permanently disabled was retroactive to June 1, 1999.

Plaintiff received disability retirement benefits from PERS retroactive to June 1, 1999.

Plaintiff was male and all of the other employees in his department were male.

Plaintiff filed his Complaint in this action on February 1, 2002.

2.    **Disputed Facts:**

The parties dispute the following facts:

Plaintiff and his second wife have a history of altercations.

William Miller, the Director of Public Safety, also referred Plaintiff in 1996 to Dr. John Scroder for a physical evaluation based upon the following: "It has been indicated to me that Mr.

Cook has and is taking a quantity of prescription pills for stress and other medical conditions. I would like to have the following questions resolved by your office:
* Attempt to determine if there is any indication of drug dependency from Mr. Cook's prescription medication.
* Are the prescribed drugs causing adverse side effects which may affect his job performance?
* Are the prescribed doses having compounding effects?
* Are the prescribed medications effecting [sic] his personality, ability to operate heavy equipment and machinery?
*Is he medically fit to return to work as an equipment operator in public works?"

Plaintiff was made aware in 1996 of the conduct of Defendant Hubbard with respect to Plaintiff's Service Fitness Report of which Plaintiff complains in his Amended Charge No. 645.

May 12, 1999 was Plaintiff's last day of work for the City of Norwood.

Plaintiff believed himself to be prevented from working by his physical condition after May 12, 1999.

Plaintiff was off of work beginning May 13, 1999 as a result of his neck injury on May 12, 1999.

Plaintiff attempted to subsequently amend his BWC claim to include "severe depression" and "bipolar disorder" resulting from the May 12, 1999 neck injury.  These attempts were rejected by the BWC.

Plaintiff filed a Complaint in state court against the BWC and the City of Norwood challenging the rejection of his attempt to include "severe depression" and "bipolar disorder" as resulting from his neck injury on May 12, 1999.  (Complaint, Hamilton County Court of Common Pleas, Case No. A0101644.)

Plaintiff received full pay and benefits from the City of Norwood until he was determined by PERS to be permanently disabled.

Plaintiff's employment with the City of Norwood ended as a result of his disabilities which rendered him unable to perform his job duties even with reasonable accommodation.

The number of City of Norwood employees in each of 20 or more calendar weeks in the pertinent calendar year.

- Prior to his employment by the City of Norwood, Plaintiff dropped out of the Jobs Corps because "he was the only white person in the group" and he felt that he was being harassed.

- Plaintiff then enlisted in the Army for a three-year period; however, he lasted only nine months.  Plaintiff felt that the Army had misrepresented to him the training that he was to receive.

- Plaintiff has been arrested at least three times, once for telling a neighbor that he was "going to kick their butt."

- Plaintiff filed at least one domestic violence charge against his second wife.

- Plaintiff's disciplining of his daughter Stephanie resulted in Stephanie calling in 241-KIDS.

- On April 23, 1996, Plaintiff was suspended from work pending a complete psychological and physical examination.

- In May 1996, Plaintiff was referred by William Miller, the Director of Public Safety, to Dr. Monica Jackson for a psychiatric evaluation.  Jackson examined Plaintiff, finding him unfit to fulfill his duties as a heavy equipment operator. Dr. Jackson recommended that Plaintiff not return to work until he could deal appropriately with his emotions, and she suggested "psychological intervention in the form of regular psychotherapy."  Pursuant to Dr. Jackson's recommendation, Plaintiff was placed on administrative leave.

- Plaintiff returned to work following the evaluations by Drs. Jackson and Scroder on June 11, 1996.

- In 1997, Plaintiff filed grievances.

- In 1997, Plaintiff also filed an Unfair Labor Practice Charge against the City of Norwood and an Unfair Labor Practice Charge against Ohio Council 8, AFSCME #914, accusing his Union, of collaborating with the City of Norwood.

- On May 15, 1998, Plaintiff filed a charge of discrimination, Charge No. 645, with the EEOC asserting discrimination

based solely upon his age.  Plaintiff alleged that he had been replaced as Leadman because of his age.

- On June 16, 1998, Plaintiff filed an Amended Charge No. 645 asserting a cause of action based upon disability discrimination.  In the charge, Plaintiff complained that he had been denied a promotion to the position of Leadman on April 13, 1998, and that Hubbard had informed him that it was because Plaintiff had refused to operate the backhoe, which was an essential function of the job.  Plaintiff denied that he had refused to operate the backhoe and stated that the Leadman had never been required to operate the backhoe in the past.  Plaintiff also stated that on or about May 6, 1998 he learned that Hubbard had passed out Dr. Jackson's report in 1996.

- On June 16, 1998, Plaintiff filed another Charge of Discrimination, Charge Number 717, alleging retaliation for the filing of Charge Number 645.  Plaintiff alleged retaliation in the form of a letter from Defendant Hubbard advising Plaintiff that he needed an "air brake endorsement" to his drivers license in order to operate the street sweeper.

- Plaintiff has been on disability retirement since June 1, 1999.

- Plaintiff's Charges filed with the EEOC do not contain allegations of constructive discharge.

- Thoughts Plaintiff had of killing his supervisor led Plaintiff to begin psychiatric treatment at least as early as July of 1983.

- Plaintiff had long standing psychological problems dating back at least to the 1970s.

- Plaintiff is a disabled person within the meaning of the ADA.

- Defendant City of Norwood failed to post a vacation calender consistent with the terms and conditions of the collective bargaining agreement between AFSCME Local 914 and the City of Norwood for the years 1998 and 1999.

- Plaintiff(s): Whether the Defendants discriminated against the Plaintiff on the basis of his disability and created a hostile work environment by permitting the use of profanity, vulgarity and demeaning name calling of the Plaintiff.

- Whether the Defendants' actions created such a hostile work

environment that it encouraged Plaintiff's fellow employees to attempt to intimidate the Plaintiff and threaten Plaintiff's representative.

- Gary Hubbard was the Director of Service for the City of Norwood at all times pertinent to the Plaintiff's complaint.

- Kevin Cross was the Superintendent of Public Works for the City of Norwood at all times pertinent to the Plaintiff's complaint.

- Joseph Hochbein was the Mayor of the City of Norwood at all times pertinent to the Plaintiff's complaint.

- Plaintiff, at times pertinent, took numerous mood or memory altering medications.

- Plaintiff did not have an air brake endorsement to his Commercial Drivers License ("CDL").

- Whether malice has been alleged against any of the individual defendants.

- Whether the individual defendants were acting within the scope of their employment and official responsibility.

B.    <u>APPLICABLE PROPOSITIONS OF LAW:</u>

1.    **Agreed Applicable Propositions of Law**

Plaintiff did not agree with any of defendants' proposed Agreed Applicable Propositions of Law.  As a result, all propositions of law are disputed.

2.    **Disputed Applicable Propositions of Law**

The following applicable propositions of law are disputed by the parties:

- In order to show that he was performing satisfactorily, Plaintiff "must show that [he] was performing [his] job 'at a level which met [his] employer's legitimate expectations.'" <u>Stumpf v. Cincinnati, Inc.</u>, 863 F.Supp. 592, 596 (S.D. Ohio, W.D. 1994).

- A disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome.  <u>Paper Company v. Biggins</u>, 507 U.S. 604 (1993).

- 42 U.S.C. §2000e-5(c) states, in part, that "[a] charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred...."

- The Supreme Court held in <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998), that "[a] recurring point in these opinions is that 'simple teasing,' (citation omitted), offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"

- The "'mere utterance of an ... epithet which engenders offensive feelings in an employee does not sufficiently affect the condition of employment' to create a hostile work environment." <u>Coulson v. The Goodyear Tire & Rubber Company</u>, 31 Fed.Appx. 851, 2002 WL 408872 (6th Cir. 2002).

- With respect to the request for physical and mental examinations of Plaintiff, "[t]he ADA permits an employer to require a medical examination to determine qualifications for the job and for the health and safety of employees." <u>Coulson</u>, 2002 WL 408872 at *3.

- If the plaintiff has direct evidence that the employer relied on his disability in making an adverse employment decision, the plaintiff may establish his claim as follows:

  1) The plaintiff bears the burden of establishing that he or she is 'disabled.'
  2) The plaintiff bears the burden of establishing that he or she is 'otherwise qualified' for the position despite his or her disability: a) without accommodation from the employer; b) with an alleged 'essential' job requirement eliminated; or c) with a proposed reasonable accommodation.
  3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer. <u>Monette v. Electronic Data Systems Corporation</u>, 90 F.3d 1173, 1186 (6th Cir. 1996).

- "Under the approach outlined above, [Plaintiff] is required to show that he is otherwise qualified to perform the essential functions of the job, with or without accommodation from the defendant, and [Plaintiff] bears the burden of establishing that the accommodation he seeks is 'reasonable.'"

- "Moreover, employers are not required to create new positions for disabled employees in order to reasonably accommodate the disabled individual."

- Plaintiff has the "initial burden of proposing an accommodation and showing that accommodation is objectively reasonable." Monette, 90 F.3d at 1183.

- Even if Plaintiff were to argue now that he is mentally and physically capable of performing his job with some reasonable accommodation, he would be estopped from making such an argument based upon his previous numerous indications that he was mentally and physically incapable of performing the job. Hile, 1997 WL 112404 at *4-5.

- "An employment action is considered 'adverse' under the ADA if it represents 'a materially adverse change in the terms of ... employment.' Kocsis v. Multi-Care Management Inc., 97 F.3d 876, 885 (6th Cir. 1996)." Coulson, 2002 WL 408872 at *3.

- "The Sixth Circuit has repeatedly held that isolated and ambiguous comments are irrelevant and inadmissible in employment discrimination lawsuits." Sullivan v. Delphi Automotive Systems Corporation, 198 F.Supp.2d 952, 959 (S.D. Ohio, W.D. 2002).

- 42 U.S.C. §1981a(b)(3) provides with respect to damages in cases of intentional discrimination in employment that: "The sum of the amount of compensatory damages ... and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party– ... (B) in the case of a respondent who has more than 100 and fewer than 201 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $100,000; ...."

- The scope of the EEOC investigation triggered by an EEOC charge defines the substantive limits of a subsequent Title VII action, and also the parties potentially liable in that action. (Citation omitted.)  The rule in the Sixth Circuit is that the EEOC's complaint is limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination.  Givan v. Greyhound Lines, Inc., 616 F.Supp. 1223, 1227(S.D. Ohio, W.D. 1985).

- Whether utilizing direct or circumstantial evidence, Plaintiff must ultimately show that disability "was a determining factor in the

adverse action the employer took against [him]."    <u>Id</u>. at 1099.

- Following his injury on May 12, 1999, Plaintiff was unable to perform his job "satisfactorily".

- Plaintiff's ADA claim must fail as he has failed to meet the administrative prerequisites for a discrimination claim based upon disability.

- As Plaintiff knew of Hubbard's alleged conduct in publishing the contents of a medical report in 1996, his failure to file his Amended Charge No. 645 until 1998 prohibits him from proceeding on a disability claim arising from that alleged conduct.

- Plaintiff's claim must fail as he cannot establish the elements essential to a claim under the ADA.

- Plaintiff cannot establish the second element of his claim under the ADA, that he was "otherwise qualified" for the position.

- Plaintiff cannot perform the duties of his former job based upon his disabilities.

- Plaintiff has not alleged that he could perform his former job with reasonable accommodation or that he requested any such accommodation.

- Plaintiff has certified to PERS that he cannot perform any job and that he is permanently disabled based upon his mental and physical conditions.

- PERS has found that Plaintiff is permanently disabled.

- Plaintiff cannot establish that he suffered an adverse employment decision.

- Plaintiff was not discharged.  His employment ended because of his disabilities.

- Plaintiff was not "otherwise qualified" for the position.

- The Court analyzes Plaintiff's federal and state law discrimination claims simultaneously.  With regard to all matters at issue in this case, the analysis of the O.R.C. Chapter 4112 claim mirrors that of the ADA claim.  <u>Plant v. Morton Int'l. Inc.</u>, 212 F.3d 929 (6th Cir. 2000).

- Plaintiff is not entitled to front pay on his intentional discrimination claims.

- Plaintiff is entitled to no more than $100,000 total for compensatory damages on his intentional discrimination claims against the Defendant City of Norwood.

- Upon a determination that Plaintiff should not prevail on his federal claim under the ADA, Plaintiff's supplemental claim of disability discrimination pursuant to Ohio Revised Code §4112 should be dismissed.

- Plaintiff is not entitled to front pay.

- Plaintiff is not entitled to any damages.

- The rulings of the Court in the order on Motion for Summary Judgment are the law of the case.

- The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period.  Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.  National Railroad Passenger Corp. v. Morgan, No. 00-1614 (2002).

- Incidents comprising a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim.  In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment. National Railroad Passenger Corp. v. Morgan, No. 00-1614 (2002).

- A charge alleging a hostile work environment claim, however, will not be time-barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period.  National Railroad Passenger Corp. v. Morgan, No. 00-1614 (2002)

- In addition to other equitable defenses, therefore, an employer may raise a laches defense, which bars a plaintiff from maintaining a suit if he unreasonably delays in filing a suit and as a result harms the defendant. This defense "'requires proof of (1) lack of diligence by the party against whom the defense is

asserted; and (2) prejudice to the party asserting the defense."" Kansas v. Colorado, 514 U.S. 673, 687 (1995)(quoting Costello v. United States, 365 U.S. 265, 282 (1961)).

- "Commercial motor vehicle" means any motor vehicle designed or used to transport persons or property that meets any of the following qualifications:

    (1) Any combination of vehicles with a combined gross vehicle weight rating of twenty-six thousand one pounds or more, provided the gross vehicle weight rating of the vehicle or vehicles being towed is in excess of ten thousand pounds;

    (2) Any single vehicle with a gross vehicle weight rating of twenty-six thousand one pounds or more, or any such vehicle towing a vehicle having a gross vehicle weight rating that is not in excess of ten thousand pounds;

    (3) Any single vehicle or combination of vehicles that is not a class A or class B vehicle, but that either is designed to transport sixteen or more passengers including the driver, or is placarded for hazardous materials;

    (4) Any school bus with a gross vehicle weight rating of less than twenty-six thousand one pounds that is designed to transport fewer than sixteen passengers including the driver;

    (5) Is transporting hazardous materials for which placarding is required by regulations adopted under the "Hazardous Materials Transportation Act, " 88 Stat. 2156 (1975), 49 U. S. C. A. 1801,as amended;

    (6) Any single vehicle or combination of vehicles that is designed to be operated and to travel on a public street or highway and is considered by the federal highway administration to be a commercial motor vehicle, including, but not limited to, a motorized crane, a vehicle whose function is to pump cement, a rig for drilling wells, and a portable crane.  4506.01 ORC

    (A)  No person who holds a valid commercial driver's license shall drive a commercial motor vehicle unless the person is physically qualified to do so. Each person who drives or expects to drive a commercial motor vehicle in interstate or foreign commerce or is otherwise subject to 49 C.F.R. 391, et seq., as amended, shall certify to the registrar of motor vehicles at the time of application for a commercial driver's license that the person is in compliance with these standards.

Any person who is not subject to 49 C.F.R. 391, et seq., as amended, also shall certify at the time of application that the person is not subject to these standards.

(B)  A person is qualified to drive a class B commercial motor vehicle with a school bus endorsement, if the person has been certified as medically qualified in accordance with rules adopted by the department of education.

(C) (1)  Except as provided in division (C) (2) of this section, any medical examination required by this section shall be performed only by one of the following:

(a) A person licensed under Chapter 4731. of the Revised Code to practice medicine or surgery or osteopathic medicine and surgery in this state, or licensed under any similar law of another state;

(b) A person licensed as a physician assistant under Chapter 4730. of the Revised Code who practices under the supervision and direction of a physician as required under that chapter and who is authorized by the supervising physician to perform such a medical examination;

(c) A person who is a certified nurse practitioner or a clinical nurse specialist licensed under Chapter 4723 of the Revised Code who is practicing in accordance with a standard care arrangement pursuant to Section 4723.431 of the Revised Code.
(2) Any part of an examination required by this section that pertains to visual acuity, field of vision, and the ability to recognize colors may be performed by a person  licensed under Chapter 4725 of the Revised Code to practice optometry in this state or licensed under any similar law of another state.

(D)  Whenever good cause appears, the registrar, upon issuing a commercial driver's license under this chapter, may impose restrictions suitable to the licensee's driving ability with respect to the type of motor vehicle or special mechanical control devices required on a motor vehicle that the licensee may operate, or such other restrictions applicable to the licensee as the registrar determines to be necessary.

The registrar may either issue a special restricted license or may set forth upon the usual license form the restrictions imposed.  The registrar, upon receiving satisfactory evidence of any violation of the restrictions of the license, may impose a class D license suspension of the license for the period of time

specified in division.

(B)(4) of section 4510.02 of the Revised Code.

The registrar, upon receiving satisfactory evidence that an applicant or holder of a commercial driver's license has violated division (A)(4) of section 4506.04 of the Revised Code and knowingly given false information in any application or certification required by section 4506.07 of the Revised Code, shall cancel the commercial driver's license of the or any pending application from the person for a commercial driver's license or class D driver's license for a period of at least sixty days, during which time no application for a commercial driver's license or class D driver's license shall be received from the person. §4506.10 ORC.

● Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult. See generally 45 Fed.Reg. 74676 (1980). Rogers v. EEOC, 454 F.2d 234 (CA5 1971), cert. denied, 406 U.S. 957 (1972).

● The courts have consistently held employers liable for the discriminatory discharges of employees by supervisory personnel, whether or not the employer knew, should have known, or approved of the supervisor's actions.  Anderson v. Methodist Evangelical Hospital, Inc., 464 F.2d 723, 725 (CA6 1972).

● When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).

● Whether Defendants are entitled to immunity pursuant to Chapter 2744 of the Ohio Revised Code.

● Whether Defendants are entitled to set off for money received from collateral sources pursuant to 2744.05.

● Punitive damages cannot be awarded against individual defendants without proof of actual malice.  Rice v. CertainTeed (1999), 84 Ohio St.3d 417 and then whether the statute of limitations for alleged violations of state handicap law is governed by R.C. 2744.04 which is two years.

• C. **WITNESSES**

The parties have listed on the appropriate appendices those persons who will be called or who will be available to testify at trial. Plaintiff will file all appendices separately with the Court due to technical difficulties which plaintiff had.

1. The Plaintiff may call one or more of the witnesses identified on Appendix A hereof.

2. The Defendants may call one or more of the witnesses identified on Appendix B hereof or any witness listed by any other party in these Appendices.

3. The parties reserve the right to call without prior notice to opposing counsel refutation witnesses whose testimony could not reasonably be anticipated.

D. **EXPERT WITNESSES**

The parties propose to call the following number of expert witnesses, all of whom have been disclosed to the opposing side:

Plaintiff:

1. Dr. George Parsons, 2728 Madison Road, Cincinnati, Ohio 45209: Vocational expert who will testify to the effect on the Plaintiff of the Defendants' conduct and his ability to work.

2. David Helm, M.D., 7495 State Road #340, Cincinnati, Ohio 45255: Psychiatrist who will testify by deposition to the effect on the Plaintiff of the Defendants' conduct.

3. Dr. Michael Brookshire, 333 12th Street, Suite 3, Dunbar, West Virginia 25064: Economist who testify to lost wages and lost economic benefits as a result of Defendants' conduct.

Defendants:

1.  Merritt Oleski, Ph.D. (by deposition)
    11590 Century Blvd., Suite 112
    Cincinnati, Ohio 45246

2.  E. Don Nelson, Pharm.D.
    University of Cincinnati
    College of Medicine
    234 Goodman Street
    Cincinnati, Ohio 45267

3.  J. Nick Marzella, Ph.D.
    Association for Psychotherapy, Inc.
    785 Broad Street
    Columbus, Ohio 53205

4.  Jennifer Stoeckel, Ph.D.
    375 Glensprings Drive, Suite 105
    Cincinnati, OH 45246

Defendants reserve the right to elicit expert opinion testimony from any of Plaintiff's treating physicians or expert witnesses or any of the expert witnesses identified by the other Defendants.

The curriculum vitae of the expert witnesses and a binding summary of their written reports are attached as Appendix C.

The parties certify they have complied with Rule 26 of the Federal Rules of Civil Procedure pertaining to expert testimony.

E.    **EXHIBITS**

The parties will offer as exhibits those items listed on appendices hereof prepared in accordance with Section C of the Order Instructing Certain Pretrial and Trial Procedures as follows:

(1)    Joint Exhibits: Appendix D
       (Roman Numerals)

(2)    Plaintiff's Exhibits: Appendix E
       (Arabic numbers1-499; 1000-1499, etc.)

(3)    Defendants' Exhibits: Appendix F
       (Arabic numbers 500-999, 1500-1999, etc.)

F.     **DEPOSITIONS, INTERROGATORIES AND ADMISSIONS**

Evidence from the following witnesses will be presented by deposition:

Plaintiff:

(1) Plaintiff reserves the right to use other prior testimony, including, but not limited to depositions or testimony under oath of one or more of the Defendants.

Note my objection in the same section to the introduction of any items for impeachment purposes not disclosed in the discovery process to be used by the Defendants.

**(2)** Plaintiff will call Dr. Helm to testify by deposition.

Defendants:

(1) Deposition of Dennis J. Cook taken September 25 and 26, 2002.
(2) Plaintiff's Responses to Interrogatories Propounded by the Defendant City of Norwood.
(3) Deposition of Dr. Merritt Oleski.

Defendants reserve the right to use other prior testimony, including, but not limited to, depositions, interrogatories, and admissions, for impeachment purposes without prior notice to opposing counsel.

G.     **DISCOVERY**

Discovery has been completed.

H.     **PENDING MOTIONS**

(1) Defendant City of Norwood's Motion for Order in Limine to Exclude Evidence.
(2) Defendant City of Norwood's Motion for Order in Limine to Find Plaintiff Dennis J. Cook Incompetent to Testify at Trial.
(3) Plaintiff' Motion for Order in Limine to Exclude Evidence.

(4) Plaintiff's Motion for Order in Limine to Exclude to Preclude the introduction into evidence or the testimony of Defendant's Experts.

IV.     **SETTLEMENT EFFORTS**

The parties have made a good faith effort to negotiate a settlement.

**IT IS SO ORDERED.**

_____
HERMAN J. WEBER, SENIOR JUDGE
UNITED STATES DISTRICT COURT


**    s/Robert G. Kelly            **
Robert G. Kelly
4353 Montgomery Road
Norwood, Ohio  45212


**    s/Lawrence E. Barbiere        **
Lawrence E. Barbiere, Esq.
Ohio Supreme Ct. No: 0027106
Schroeder, Maundrell, Barbiere & Powers
Attorney for Defendant City of Norwood
11935 Mason Road, Suite 110
Cincinnati, Ohio  45249


**    s/W. McGregor Dixon, Jr.      **
W. McGregor Dixon, Jr., Esq.
Shipman, Dixon & Livingston
Attorney for Defendant Joseph Hochbein
215 West Water Street
Troy, Ohio  45373

**    s/Steven C. Martin          **
Steven C. Martin, Esq.
Ziegler & Schneider
Attorney for Defendand Gary Hubbard
541 Buttermilk Pike, Suite 500
Covington, Kentucky  41017-5710


**    s/James F. Brockman          **

James F. Brockman, Esq.
Ohio Supreme Court No: 0009469
Edward Roberts, Esq.
Lindhorst & Dreidame
Attorney for Defendant Kevin Cross
312 Walnut Street, Suite 2300
Cincinnati, OH  45202

# APPENDIX A
PLAINTIFF'S WITNESS LIST

# APPENDIX B

## DEFENDANT CITY OF NORWOOD'S WITNESS LIST

**Defendants Hochbein, Cross and Hubbard also reserve the right to call the following witnesses:**

A.  Larry Partin:          Expected to testify that he informed Plaintiff in 1996 that Defendant Hubbard had read the Fitness for Duty Evaluation prepared by Dr. Monica Jackson on 4/30 and 5/2, 1996 to Larry Partin, Dennis Jones, and Andy Stapleton while at a jobsite on Drex Ave.

B.  Janet Kennedy:         Expected to testify with respect to how many employees were employed by the City of Norwood in each of 20 or more calendar weeks in the pertinent calendar year.

C.  Tom White:            Expected to testify regarding events that occurred between 1997 and 1999, which led to his resignation from Local 914 including, but not limited to, the filing of numerous grievances by Plaintiff.

D.  Joseph Hochbein:       Expected to testify according to his deposition to matters including, but not limited to, policies and procedures of the City of Norwood.

E.  The parties.

F.   This defendant reserves the right to call any witness listed by any other party on its witness list.

# APPENDIX C

## DEFENDANT CITY OF NORWOOD'S SUMMARIES OF EXPERT WITNESSES' WRITTEN REPORTS

**Defendants Hochbein, Cross and Hubbard also reserve the right to call the following expert witnesses:**

EXPERT

B.  Merritt Oleski, Ph.D.

    (1) Dr. Oleski will testify by deposition and his deposition will be filed contemporaneously herewith.

    (2) Exam for BWC dated October 24, 2000: Based upon a review of psychological files provided, and the mental status exam and clinical interview of 10/24/2000, Oleski found Cook to be suffering from Bipolar Disorder, which "cannot be caused by a work injury." "Normal onset of bipolar disorder is entirely biologically based."

CC.  E. Don Nelson, Pharm.D.

    (1) Curriculum vitae and written report attached hereto which contains a written summary of his anticipated testimony.

CC.  Nick Marzella, Ph.D.:

    (1) Curriculum vitae and written reports attached hereto.

    (2) Fitness for Duty Evaluation dated 8/17/98: "Based on this examiner's review of all data submitted, as well as, an extensive interview and psychological testing conducted on Mr. Dennis Cook, I find that he is psychologically unfit to perform the duties of a heavy equipment operator ie. street sweeper or any other job for the City of Norwood that requires interaction with the public.  His levels of paranoia and lack of insight into how his behavior affects others make him a high risk for future performance difficulty on the job.  Given his personality structure, it would not be unlikely that he would engage in bizarre and/or litigious behavior.  Furthermore, due to his level of paranoia, he will interpret any negative findings as a 'conspiracy' and further attempt to deflect responsibility from himself.  His levels of frustration, and anger make it difficult for him to recognize appropriate boundaries.  Furthermore, Mr. Cook's psychological status is not of recent etiology.  One can trace the beginnings of his problems from his early childhood.  He has displayed a pattern of deceitfulness, impulsive behavior, and self defeating actions throughout his life.  His inability to recognize his shortcomings have further contributed to his levels of paranoia."

(3) Report dated 10/22/02: "Dennis Cook has suffered long-standing psychological problems. Throughout the course of his life, he has experienced interpersonal difficulty, conflict with authority, difficulty in the work place and family problems. He has had multiple psychiatric diagnoses attributed him beginning at a relatively young age. The early manifestations of his bipolar disorder can be seen in his developmental history. Bipolar type II disorders are associated with significant social and vocational difficulties and increased risk of suicide. Mr. Cook's cyclical alternations of major depressive symptoms characterized by poor concentration, loss of pleasure in most activities, feelings of hopelessness and futility, coupled with periods of mania characterized by paranoia, expansiveness, flight of ideas, and distractability, have brought him into significant psychosocial and workplace conflict.

Mr. Cook's behavioral problems and conflicts with his environment, including the City of Norwood, are manifestations of his mental illness and not caused by the City. At times, he has functioned better than at others generally due to psychiatric management. Nonetheless, he will continually come into conflict with his environment due to his illness, and as stated by psychiatrist Schaen and Enzer, when Mr. Cook was approximately nineteen years old 'this is a personality disturbance requiring long-term treatment.'

Given Mr. Cook's psychological condition, he is unable to engage in substantial remunerative employment. Since this examiner's evaluation of Mr. Cook in 1998, Mr. Cook has experienced cyclical mood swings as indicated by the medical/psychological records of Drs. Helm, Parsons, Oleski, and social worker Calderon. Upon review of these medical records and observing Mr. Cook's video taped depositions, it is with a reasonable degree of psychological certainty that Mr. Cook continues to experience a Bipolar Affective Disorder type II, and is psychologically disabled from engaging in substantial remunerative employment. All opinions expressed in this report are offered with a reasonable degree of psychological certainty."

D.    All experts designated by any other party and all treating or examining physicians or psychologists.

# APPENDIX D
## JOINT EXHIBITS

# APPENDIX E

PLAINTIFF'S EXHIBITS

# Appendix F

### DEFENDANT CITY OF NORWOOD'S EXHIBITS
### (Arabic numbers 500-999, 1500-1999, etc.)

**All Defendants reserve the right to introduce these exhibits.**

501.   Ohio Commercial Driver License issued to Plaintiff March 31, 1994 with the restriction "No Passenger-Class A".

502.   Memo from Gary Hubbard to Plaintiff dated April 22, 1996 regarding Plaintiff's wife contacting Hubbard's wife.

503.   Letter from William J. Miller, Director of Safety for the City, to Plaintiff dated April 29, 1996 instructing him to report to Dr. Monica Jackson, Daum & Associates, for a psychological examination.

504.   Letter from Miller to Dr. Jackson dated May 1, 1996 regarding Plaintiff's behavior and questions regarding the effects of the medications taken by Plaintiff.

505.   Letter from Miller to Dr. John Scroder dated May 1, 1996 requesting a medical exam of Plaintiff and answers to questions regarding medications being taken by Plaintiff.

506.   Letter from Miller to Kim Ford in Auditor's Office dated May 1, 1996 notifying her of suspension with pay of Plaintiff effective April 23, 1996 pending completion of psychological and physical examinations and clearance to return to work.

507.   Fitness for Duty Evaluation of Plaintiff by Dr. Jackson dated 4/30 and 5/2/96.

**508.**   **Records of Daum & Associates.**

509.   Letter from Miller to Plaintiff dated May 10, 1996 requesting Plaintiff report with his representative regarding Plaintiff's duty status.

510.   Memo from Miller to Plaintiff dated May 13,1996 advising that psychological exam determined Plaintiff should not return to work until therapy program completed and Dr. Jackson releases him to return to work.

511.   Letter from Hubbard to Dr. Jackson dated May 14, 1996 advising of conduct of Plaintiff's daughter in response to

Plaintiff's suspension pending completion of therapy program and reevaluation by Dr. Jackson.

512.    Memo from Miller posted at Public Works dated May 14, 1996 advising that Plaintiff was not terminated, but that he is on medical leave until completion of therapy.

513.    Letter from Miller to Dr. David Helm, M.D., dated May 14, 1996 advising Helm of Dr. Jackson's recommendation.

514.    Letter from Hubbard to Walter J. Edwards, AFSCME-Ohio Council 8, dated June 26, 1996 regarding grievances and advising that Andy Stapleton is better qualified to operate the backhoe.

515.    Settlement Agreement dated July 12, 1996 wherein Plaintiff releases any claims "connected with his suspension in 1996 and or his medical evaluations."

516.    Letter from Edwards to Plaintiff dated November 6, 1996 instructing Plaintiff not to pursue frivolous grievances.

517.    Letter from Hubbard to Kevin Cross dated March 18, 1997 advising that there is no "light duty."

518.    An Agreement and Release between Plaintiff and the City of Norwood dated March 18, 1997 wherein Plaintiff "agrees that he is not entitled to operate the backhoe."

519.    Letter from Hubbard to Cross dated April 21, 1997 instructing street sweeper to run earlier to avoid backup caused during morning rush hour.

520.    Letter to Plaintiff from Cross dated July 25, 1997 notifying him of a disciplinary hearing for giving a child a ride on the City's street sweeper.

521.    Letter from Cross to Plaintiff dated July 30, 1997 providing written warning for riding a non-employee on City equipment.

522.    Letter from Cross to Ray Erwin dated September 25, 1997 regarding 1997-98 snow removal.

523.    Letter from Hubbard to Erwin dated October 31, 1997 advising not to use City time for preparation of grievances or other Union matters.

524.        Letter from Hubbard to Erwin dated December 5, 1997
            regarding snow overtime list.

525.        Grievance No. 12324 dated December 15, 1997 grieving
            change from weekly to bi-weekly pay period.

526.        Grievance No. 12325 dated December 17, 1997 grieving
            denial of leave to attend SERB seminar.

527.        Grievance No. 12326 dated December 17, 1997 grieving
            labor-management meeting held on December 5, 1997
            without all three representatives present.

528.        Letter from Hubbard to Erwin dated December 18, 1997
            responding to Grievance No. 12325.

529.        Grievance No. 12323 dated December 18, 1997 regarding
            salt truck overtime.

530.        Letter from Hubbard to Erwin dated December 18, 1997
            denying Grievance No. 12323.

531.        Grievance No. 12328 dated January 2, 1998 grieving
            harassment and discrimination.

532.        Letter from Hubbard to Erwin dated January 6, 1998
            responding to Grievance No. 12325.

533.        Letter from Erwin to Local 914 dated February 19, 1998
            instructing members to ignore notice of meeting for February
            20, 1998 at Public Works.

534.        Ohio Commercial Driver License issued to Plaintiff on
            February 23, 1998 restricting Plaintiff to "Veh's. W/O Air
            Brakes-CDL".

535.        Letter from AFSCME-Ohio Council 8 to Plaintiff dated
            February 3, 1998 regarding number of frivolous grievances
            being filed by Local 914.

536.        Letter from Plaintiff to Gerald W. McEntee, International
            President of AFSCME, dated February 25, 1998 complaining
            about Edwards.

537.        Letter from Joseph Hochbein to Erwin dated March 12, 1998
            denying Grievance No. 12324.

538.    Letter from Paul J. Bazzano to Erwin dated March 17, 1998 finding no insubordination for posting of letter to Local 914 on February 19, 1998.

539.    Letter to Erwin from Cross dated March 24, 1998 regarding Leadmen responsibilities.

540.    Letter to Plaintiff from Cross dated March 24, 1998 regarding Leadmen responsibilities.

541.    Memo from Cross to Plaintiff dated March 24, 1998 regarding daily operations as Acting Leadman of Street Department.

542.    Letter dated March 25, 1998 from Plaintiff to Edwards charging Edwards with being inept.

543.    Letter dated March 27, 1998 from Plaintiff to Edwards duplicating March 25, 1998 letter with additional individuals carbon copied.

544.    Letter from Joseph T. Mordino, Assistant Law Director, to Union dated March 31, 1998 regarding flurry of grievances.

545.    Letter from Cross to Plaintiff dated April 3, 1998 concerning getting hot patching done early in day.

546.    Letter from Cross to Plaintiff dated April 6, 1998 regarding truck parked the wrong way with keys in the ignition.

547.    Letter from Hubbard to Cross dated April 13, 1998 regarding Plaintiff using jackhammer near gas line.

548.    Letter from Hubbard to Cross dated April 13, 1998 concerning removal of Plaintiff as Leadman based on Plaintiff's inability to operate the backhoe.

549.    Letter from Hubbard to Erwin dated April 16, 1998 regarding Plaintiff stamping envelopes received.

550.    Grievance No. 12340 dated April 17, 1998 grieving denial of position of Leadman of Street Crew.

551.    Letter dated April 20, 1998 from Tom White to Erwin resigning as Vice-President of Local 914.

552.    Unfair Labor Practice Charge 98-ULP-05-0212 filed by Plaintiff on May 4, 1998 regarding denial of Leadman position due to union activities.

553.  EEOC Charge Number 221980645 filed May 15, 1998.

554.  Letter from Hubbard to Cross dated May 20, 1998 advising that Plaintiff's CDL has a restriction prohibiting operation of vehicles with air brakes and instructing that Plaintiff be removed from operation of street sweeper with air brakes.

555.  Ohio Commercial Driver License issued to Plaintiff on May 27, 1998 with restriction "No Passenger-Class A".

556.  EEOC Charge Number 221980717 filed June 16, 1998.

557.  EEOC Amended Charge Number 221980645 filed June 16, 1998.

558.  Letter from Hubbard to Plaintiff dated July 2, 1998 regarding Plaintiff refusing to operate jackhammer and claiming sick leave to avoid it.

559.  Report by J. Nick Marzella, Ph.D. to Hubbard dated July 16, 1998.

560.  Grievance No. 5149 dated July 22, 1998 grieving examination on July 15, 1998.

561.  Letter from Hubbard to Plaintiff dated July 22, 1998 removing driving privileges pending evaluation of current medications.

562.  Letter from Hubbard to Plaintiff dated July 28, 1998 regarding Plaintiff shoveling hot asphalt while wearing rubber boots.

563.  Unfair Labor Practice Charge, 98-ULP-08-0452, dated July 31, 1998, alleging removal from position as street sweeper operator on May 20, 1998.

564.  Memo from Hubbard to Cross dated July 22, 1998 instructing removal of Plaintiff from driving status of City vehicles due to prescribed medications.

565.  Memo to Plaintiff from Cross dated July 30, 1998 regarding Plaintiff saw cutting without his mask.

566.  Grievance Report No. 5151 dated July 31, 1998.

567.  Letter from Cross to Joe Lacinak, Union Steward, dated July 31, 1998.

568.        Grievance NO. 5195 dated August 2, 1998 grieving removal
            from position of street sweeper operator.

569.        Letter from Hubbard to Cross dated August 3, 1998 regarding
            lack of signage.

570.        Letter from Cross to Plaintiff dated August 14, 1998 regarding
            placing Plaintiff on administrative leave pursuant to Fitness
            for Duty Evaluation of Dr. Marzella.

571.        Fitness for Duty Evaluation of Plaintiff by Marzella dated
            August 17, 1998.

572.        Letter from Mordino to Holly M. Levine, SERB, dated
            September 8, 1998 responding to Plaintiff's ULP Charge No.
            98-ULP-08-0452 explaining Plaintiff's removal from street
            sweeper operation.

573.        Letter from Cross to Plaintiff dated September 14, 1998
            regarding no disciplinary hearing on signage failure.

574.        Letter from Cross to Plaintiff dated November 6, 1998
            regarding need for a medical excuse for bathroom breaks.

575.        Grievance No. 1087 dated November 6, 1998 grieving
            removal as street sweeper operator because of prior
            grievances.

576.        Unfair Labor Practice Charge No. 98-ULP-11-0658 dated
            November 6, 1998.

577.        Letter from Hubbard to Dr. Bingham dated November 11,
            1998 requesting opinion regarding effect of medications on
            Plaintiff's ability to operate heavy equipment.

578.        Letter from Hubbard to Plaintiff dated November 13, 1998
            requiring Plaintiff to report to Dr. Bingham on November 13,
            1998.

579.        Letter from Dr. Bingham to Hubbard dated November 16,
            1998 regarding examination of Plaintiff.

580.        Letter from Timothy A. Garry, Jr., City Law Director, to Jack
            Patrick, EEOC, dated November 20, 1998 explaining reason
            for Plaintiff's removal from street sweeper with air brakes.

581.  Letter from Cross to Rusty Vanover, Union Steward, dated November 30, 1998 explaining Plaintiff's removal from operation of street sweeper.

582.  Unfair Labor Practice Charge No. 99-ULP-01-0039 filed on January 26, 1999.

583.  Letter from Stacy M. Wall, Assistant Law Director, to Holly Levine, SERB, dated February 16, 1999, summarizing events in response to Plaintiff filing 98-ULP-11-0658.

584.  Letter from Wall to Gary Kennedy, SERB, dated February 18, 1999, summarizing events in response to Plaintiff filing 99-ULP-01-0039.

585.  Certified copy of Plaintiff's Complaint against Union, <u>Plaintiff v. AFSCME, Ohio Council 8</u>, C-1-99-801, filed September 28, 1999.

586.  Certified copy of Order Granting in Part and Denying in Part Defendant's Motion to Dismiss.

587.  Report for BWC of Merritt S. Oleski, Ph.D. dated October 24, 2000.

588.  All records produced by Group Health Associates.

589.  Certified copy of Group Health Associates medical records of Plaintiff obtained as a result of the April 15, 2004 records deposition from medical records custodian, Charmaine Siegel.

590.  **Certified copy of PERS file, including:**

590a.  Letter from Maurice C. Mast dated October 25, 1999 recommending Plaintiff's disability claim based upon physical condition be denied.

590b.  Letter from Dr. Arnold R. Penix, M.D., to PERS dated November 12, 1999 opining that Plaintiff is permanently and totally disabled due to his medical condition.

590c.  Letter from Dr. William Beatty to PERS dated February 2, 2000 finding Plaintiff permanently disabled due to his mental condition.

590d.  Letter from John Finfgeld, PERS to Plaintiff dated February 23, 2000 advising approval of disability application.

590e.  Letter from PERS to Plaintiff dated May 31, 2000 regarding disability and retirement benefits.

**591.**        **Documents from Deposition of David A. Helm, M.D., including:**

591a.  Diagnosis of Plaintiff as Bipolar II dated October 26, 1999.

591b.  Records from Health Maintenance Plan, predecessor of Group Health Associates.

591c. Letter from Dr. Theodor Bonstedt to Plaintiff dated October 1, 1984 regarding his failure to appear for appointments and terminating his psychiatric care as of October 31, 1984.

591d.  PERS form completed December 15, 2001.

591e.  Handwritten records.

592.        Letter to Attorney Robert Kelly dated July 19, 1999.

593.        Letter to Attorney Robert Kelly dated September 11, 1998.

594.        CV of Dr. Nick Marzella (attached).

595.        Report of Dr. Nick Marzella (attached).

596.        CV of Dr. Jennifer Stoeckel (attached).

597.        Report of Dr. Jennifer Stoeckel (attached).

598.        CV of E. Don Nelson, Pharm. D. (attached).

599.        Report of E. Don Nelson, Pharm. D. (attached).

600.        Roster of City of Norwood Employees for the years 1998, 1999, 2000, 20001, 20002, 2003.

**\*Defendants reserve the right to introduce or refer to all exhibits listed by plaintiff.**

# APPENDIX B
## DEFENDANT KEVIN CROSS' WITNESS LIST

Defendant Kevin Cross hereby adopts Defendant City of Norwood's witness list, with the following addition:

E.     Kevin Cross:          Expected to testify as to his depositions to matter including, but not limited to, his duties and actions for the City of Norwood.

Defendant Kevin Cross hereby reserves the right to call any witnesses listed by any other party.

# APPENDIX C

## DEFENDANT KEVIN CROSS' LIST OF EXPERT WITNESSES

Defendant Kevin Cross hereby adopts Defendant City of Norwood's Expert witness list, with the following addition:

B(2) Summary of Nelson's report, provided to all counsel on or about November 7, 2002 as an attachment to Defendant Cross' Second Supplemental Designation of Expert Witnesses:

1. Cook was regularly taking chloral hydrate at night to sleep for months. This is known to cause memory loss with chronic use, and Cook's memory is impaired secondary to his chronic use of chloral hydrate.
2. Cook's memory is also impaired by the chronic use of lorazepam Xanax-R.
3. Cook made contradictory statements in his video testimony because he cannot remember his prior statements. The contradictions are a concrete example of loss of recent memory, which is seriously impaired by the multiple drugs that Cook is taking.
4. Cook is taking tramadol Ultram-R. During his deposition, he can be seen to doze off, then arouse with a start, which is classic for opioid intoxication. Nelson's opinion is that Cook was intoxicated with Ultram-R during the deposition, impairing his memory and mentation.
5. Cook's memory and mentation were also impaired by his taking of cyclobenzaprine.
6. Cook is probably overdosed with SSRI's, which result in run-on and anxiety.
7. Cook is receiving excess doses are different SSRI's
8. Cook's memory and mentation were impaired by his lithium intake.
9. Cook's mental sate at the deposition was impaired by the multiple prescription drugs that he was taking. Cook's medical records contain several references to lost or stolen drugs and calls for pre-mature refills. Nelson opines that these are consistent with abuse of these prescription drugs. It is probable that Cook was taking more than the amount directed. Excess use of these drugs will only increase their negative effects.

Monica Jackson, Ph.D.:

Fitness for duty evaluation performed by Monica Jackson, Ph.D. and James M. Daum, Ph.D. Evaluation states that Dennis Cook is a forty-one year old individual who was referred for a fitness for duty evaluation due to concerns expressed by his supervisors and co-workers regarding inappropriate outbursts of anger and expressions of his religious beliefs in the workplace. Mr. Cook admits to having been under stress within the past year. Mr. Cook has been seeing Dr. Helm for the past year. He readily admits to having an anger control problem and said the medication prescribed is to help him deal with this. He admits to having had a physical altercation with his daughter who was sixteen years of age at the time just prior to having seen Dr. Helm. He said that he was attempting to physically discipline her when she pulled away and they both fell onto the floor and bumped into a heater. This resulted

in her having a bruise on her chest and 241-kids were called in and they recommended that he get help. He felt he did need assistance in dealing with his emotions so he went to see Dr. Helm. In his explanation for having been observed calling Mr. Hubbard Lucifer, Mr. Cook said that he did not directly call him that but rather said that in explaining his disagreement with Mr. Hubbard he had said it's the Jesus in me fighting the demon in him. Mr. Cook's written assessment materials indicate he has difficulty admitted to conflicts and emotional difficulties. Rather he uses denial and repression to deal with difficult situations simply stating they don't exist. He can appear to be skillful in social relationships but his relationships tend to be superficial. He may blame problems on physical complaints and not recognize what role he plays in his own negative circumstances.

Taken all together, Mr. Cook has had a year of much change and turmoil in his life. He has had financial difficulties, marital problems, problems with his children and a new administration at work and problems with his supervisors. He has a history of inappropriate angry outbursts and this has caused problems at home and work. Although he is taking medication to assist him in this area it has not sufficiently solved the problem. His anger and frustration continue to cause problems and he has difficulty maintaining the appropriate professional boundaries. His inappropriate expressions of religious beliefs has alienated some of his co-workers and thus interferes with his working relationships. His job as a street sweeper does put him in contact with citizens as he goes about his job. There may be occasions where his angry outbursts could cause further problems for him if he is not able to more appropriately deal with his emotions. Mr. Cook's difficulties require further psychiatric attention as well as psychological intervention in the form of regular psychotherapy.

On the basis of this assessment, it is concluded that Dennis Cook is psychologically unfit to fulfill the duties of a heavy equipment operator for the City of Norwood.

Defendant Kevin Cross hereby reserves the right to call any witnesses listed by any other party.