1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF OHIO

3                  WESTERN DIVISION

4                     - - -

5    DENNIS COOK,              :

6       Plaintiff,            :

7       vs.                   :CASE NO. C-1-02-073

8    CITY OF NORWOOD, et al.,:

9       Defendants.           :

10                    - - -

11         Deposition of MERRITT S. OLESKI, Ph.D.,

12    a witness herein, taken by the defendants as

13    upon cross-examination, pursuant to the Federal

14    Rules of Civil Procedure and pursuant to Notice

15    to Take Deposition as to the time and place and

16    stipulations hereinafter set forth, at 11590

17    Century Boulevard, Suite 112, Sharonville,

18    Ohio, at 10:00 A.M. on Thursday, March 27,

19    2003, before Darlene Anthony, RPR, a Registered

20    Professional Reporter and Notary Public within

21    and for the State of Ohio.

22                    - - -

23                              ORIGINAL

24

25

```
 1   APPEARANCES:

 2          On behalf of the Plaintiff:

 3                 ROBERT KELLY, ESQ.
                   Attorney at Law
 4                 4353 Montgomery Road
                   Cincinnati, Ohio  45212
 5

 6          On behalf of the Defendant, City of
            Norwood:
 7
                   ROBERT HILLER, ESQ.
 8                    of
                   Schroeder, Maundrell, Barbiere &
 9                 Powers
                   Governor's Knoll, Suite 110
10                 11935 Mason Road
                   Cincinnati, Ohio  45249
11

12          On behalf of the Defendant, Gary
            Hubbard:
13
                   STEVEN C. MARTIN, ESQ.
14                    of
                   Ziegler & Schneider, P.S.C.
15                 541 Buttermilk Pike, Suite 500
                   P.O. Box 175710
16                 Covington, Kentucky 41017-5710

17
            On behalf of the Defendant, Kevin
18          Cross:

19                 JEFFREY A. WILLIS, ESQ.
                      of
20                 Lindhorst & Dreidame Co., LPA
                   312 Walnut Street
21                 Suite 2300
                   Cincinnati, Ohio  45202-4091
22

23
                      - - -
24

25
```

1            S T I P U L A T I O N S

2            It is stipulated by counsel for the

3   respective parties that the deposition of

4   MERRITT S. OLESKI, Ph.D., a witness herein, may

5   be taken at this time by the defendants as upon

6   cross-examination and pursuant to the Federal

7   Rules of Civil Procedure, all other legal

8   formalities being waived by agreement; that the

9   deposition may be taken in stenotypy by the

10   Notary Public-Court Reporter and transcribed by

11   her out of the presence of the witness; that

12   the transcribed deposition was submitted to the

13   witness for examination and signature and that

14   signature may be affixed out of the presence of

15   the Notary Public-Court Reporter.

16                - - -

17

18

19

20

21

22

23

24

25

1                    I N D E X

2                                    PAGE

3    BY MR. HILLER:

4       Cross                          5

5       Recross                       34

6    BY MR. KELLY:

7       Cross                         19

8       Recross                       35

9

10                  E X H I B I T S

11                                    PAGE

12   Defendant's Exhibit 1           10

13

14

15

16

17

18

19

20

21

22

23

24

25

                        MERRITT S. OLESKI, Ph.D.

1

2    of lawful age, a witness herein, being first

3    duly sworn, as hereinafter certified, was

4    examined and deposed as follows:

5                    CROSS-EXAMINATION

6    BY MR. HILLER:

7            Q.    Would you state your name?

8            A.    Merritt S. Oleski.

9            Q.    My name is Robert Hiller, and

10   along with Larry Barbiere we represent the City

11   of Norwood in this case.  Could you state your

12   business address?

13           A.    I have several but the one we're

14   at now will more than suffice.  It's 11590

15   Century Boulevard, Springdale, Ohio 45246.

16           Q.    You are a psychologist?

17           A.    Yes, I am.  Neuropsychologist and

18   clinical psychologist.

19           Q.    Could you explain what your

20   educational background is?

21           A.    Sure.  I have a Ph.D. from

22   Vanderbilt University in psychology.

23           Q.    And where did you go to school,

24   undergraduate?

25           A.    University of Massachusetts.

1          Q.    And what year did you graduate?

2          A.    1975.

3          Q.    And what was your major?

4          A.    I had two majors, philosophy and

5     psychology.

6          Q.    Did you also get a Masters?

7          A.    Master degree from University of

8     Dayton in 1978.

9          Q.    And what was that in?

10         A.    Clinical psychology.

11         Q.    You may have already said this but

12    what is your Ph.D. in from Vanderbilt?

13         A.    It's in psychology, and the two

14    areas within psychology are clinical psychology

15    and neuropsychology.  You designate areas.

16         Q.    And what year did you get your

17    Ph.D.?

18         A.    1982.

19         Q.    And briefly, could you tell us

20    what your professional career has been since

21    you got your Ph.D.?

22         A.    Did an internship at Ohio State in

23    neuropsychology, health psychology and pain

24    management.  Worked at St. Elizabeth Medical

25    Center in Dayton for approximately two years --

1    something like '83 through '84.  The end of '82

2    through '84 there.  And I was a psychologist

3    doing those three things, neuropsychology,

4    clinical psychology and pain management.

5              Then I came down to the University

6    of Cincinnati as an assistant professor with

7    the School of Medicine, and I was in the

8    Department of Neurology attached to the

9    Division of Physical Medicine and

10   Rehabilitation, acronym PM&R, and I was there

11   maybe about a year, year and-a-half.  And I did

12   the same kind of thing, the clinical

13   psychology, neuropsychology and pain

14   management.

15             Then I went over to Jewish

16   Hospital approximately the end of 1984,

17   beginning of 1985.  I overlapped, actually.

18   Then I was there until the hospital closed at

19   the end of 1997, and I did two basic things, I

20   was the head of psychology on rehab, that's PMR

21   again, and from '95 through '97 I ran -- I was

22   the director of the pain program over there.  I

23   had an outpatient practice at the same time.

24   And that's it, in essence.

25             Q.   Is there a license that one in

1    your field needs to practice?

2         A.   Yes, there is.

3         Q.   And where are you licensed?

4         A.   State of Ohio.

5         Q.   And what is your license in?

6         A.   Psychology.

7         Q.   When did you become licensed in

8    Ohio?

9         A.   1982 or '3.  Call it '83.

10        Q.   And you're presently licensed in

11   Ohio?

12        A.   Yes, I am.

13        Q.   What is your present practice?

14        A.   I do BWC disability

15   determinations.  I assume that's part of the

16   reason I'm here.  I do neuropsychology and I do

17   the chronic pain management.

18        Q.   How long have you done disability

19   determinations for the Bureau of Workers'

20   Compensation, approximately?

21        A.   Four years, four and a half years.

22   I'd say around four and a half years, something

23   like that.  I may have done some earlier in the

24   '90s and '80s under a different basis, but I

25   recertified back around '96 or '7, somewhere

1    around there, and I've been doing them since

2    then.   Do several a week.

3         Q.    In general terms, when you do a

4    disability determination for BWC, you would get

5    your assignment directly from the Bureau?

6         A.    They send me a schedule with one,

7    two, three names on it, and they send me

8    medical files, psychology files, and I review

9    those and see the person.

10        Q.    And then write a report?

11        A.    Yes, I do.

12        Q.    In this case I believe you saw

13   Dennis Cook, who is the plaintiff in this case?

14        A.    Yes, I did.

15        Q.    And when was it that you saw him?

16        A.    Apparently -- I say apparently

17   because I'm just going from the date here,

18   October 24th, the year 2000.

19        Q.    And just to make sure it's clear,

20   he was sent to you for evaluation by the Bureau

21   of Workers' Compensation?

22        A.    That is correct.

23        Q.    He wasn't sent by the City of

24   Norwood or his own attorney?

25        A.    No, not that I'm aware of at all.

1    No, he was sent by the Bureau.

2         Q.    And I believe you are looking at a

3    copy of your report?

4         A.    Yes, I am.

5         Q.    I'm going to hand you another copy

6    that I've marked as Defendant's Exhibit 1, and

7    could you briefly tell me that that is?

8         A.    This is an IME, Independent

9    Medical Evaluation, addressing requested claim

10   allowance in this case -- two claim allowances.

11   Do you want me to go in this in any kind of

12   detail?

13        Q.    Not in that much detail.

14   Essentially, that would be --

15        A.    This is my evaluation.

16        Q.    This is a copy of the letter with

17   your evaluation of Mr. Cook that you sent back

18   to the Bureau of Workers' Compensation?

19        A.    Yes, it is.

20        Q.    And what is it dated?

21        A.    I don't see the date on here.  Oh,

22   there is a date when the Bureau stamped it, and

23   I can use that date I guess.

24        Q.    Do you know, in your normal

25   practice, given the date of examination --

1          A.    This would have been turned around

2     within a week or so.

3          Q.    Within a week?

4          A.    Actually, back then I was turning

5     this around even faster, so probably within

6     three days, literally.

7          Q.    And would you say that that's a

8     fair and accurate copy of the report that you

9     sent to BWC?

10         A.    It does look like that, yes.

11         Q.    When Mr. Cook came into your

12    office, I assume you spoke with him?

13         A.    Yes, I did.

14         Q.    And had an opportunity to observe

15    him?

16         A.    Yes, I did.

17         Q.    What of significance did he tell

18    you?

19         A.    Well, really reading from the

20    report, I need to do that -- can I quote from

21    my own report here?

22         Q.    Sure.

23         A.    I always ask people about their

24    job, to explain in their own words, and I

25    always like to have direct quotes to get the

1   flavor across.  And I quote that he "Still has

2   thoughts of going to City Hall and blowing

3   their brains out.  Still have suicidal

4   thoughts."  Then he went on to describe that he

5   was in distress.  A lot of distress,

6   emotionally.

7           Q.   What observations did you make of

8   him?

9           A.   I made the observation that he was

10  in distress.  I'm going to flip over to --

11  okay.  He presented with a very tense demeanor,

12  wandered off course, attention span and

13  concentration were impaired mostly by the press

14  of what he was feeling inside.  I do remember

15  saying back here, under opinion number six on

16  the last page, I noted that he's clearly a

17  distressed individual, and he was one of the

18  most distressed individuals I've seen in this

19  process, which is why I made -- I took the

20  opportunity to make this note.  Instead of just

21  saying, you know, not applicable, I did a

22  little commentary because I was struck by the

23  fact that he was clearly in need of some kind

24  of treatment.

25           And so I'm going to just read what

1    I wrote here.  "This IW," which is injured

2    worker, "is clearly a distressed individual as

3    noted in the comments above.  He presented a

4    medication list which included lithium

5    carbonate.  The IW also reported that he sees a

6    psychiatrist (one time a month) and a therapist

7    (two times a month) as part of the management

8    of his psychological condition.  This gentleman

9    appears to be a fragile personality, fighting

10   hard to maintain some sense of normalcy in his

11   life.  Hopefully the IW will follow through

12   with his treatment plan for this serious

13   psychological condition."

14           Q.    Just to make sure it's clear, you

15   only saw Mr. Cook on one occasion?

16           A.    This is true.

17           Q.    And it was not to treat him?

18           A.    Strictly to evaluate.

19           Q.    Were you able to formulate an

20   opinion concerning Mr. Cook's condition?

21           A.    Yes.  And as noted here in the

22   comments I just read, the lithium carbonate is

23   a big tip off.  That's the medication -- the

24   original medication, I should say, not the only

25   one, the original medication used to treat

```
 1  │  bipolar disorder, and indeed he was presenting
 2  │  with a lot of the cardinal characteristics of a
 3  │  bipolar disorder.
 4  │          Q.   Let me ask you, Doctor.  Based
 5  │  upon your education and experience and training
 6  │  and the history that you took from Mr. Cook,
 7  │  the conversation that you had with him and your
 8  │  observations, were you able to formulate an
 9  │  opinion as to his diagnosis to a reasonable
10  │  degree of medical or psychological probability?
11  │          A.   Yes.
12  │          Q.   And what was your opinion?
13  │          A.   My opinion was that he was bipolar
14  │  affective disorder at a severe level.
15  │          Q.   And in more laymen's terms, what
16  │  is that?
17  │          A.   Bipolar disorder is a disorder in
18  │  which a person may, but not necessarily, has to
19  │  experience both ends of a continuum of being
20  │  what is commonly referred to as manic and then
21  │  the other end of the continuum which would be a
22  │  depression, which can be vegitative in nature,
23  │  which you are literally closed down.  In fact,
24  │  it can play out in more subtle ways but I think
25  │  for purposes of evaluation, think of it as a
```

```
 1    continuum, and that the person can go to either

 2    end of the continuum.  And some bipolar are

 3    only at the depressive end and never experience

 4    the manic end, and vice versa.

 5            Q.    Did you formulate an opinion as to

 6    whether Mr. Cook was disabled and unable to

 7    work as of the time of your evaluation?

 8            A.    It would seem to me, based on --

 9    I'm pausing here just for a second because I

10    don't think that was strictly asked of me in

11    the six questions.  I want to go back to the

12    report here.  Your question is was he

13    psychologically disabled?

14            Q.    Yes.

15            A.    Just by dint of his condition?

16    Just the fact of his condition, regardless of

17    origin or anything else?

18            Q.    Right.

19            A.    I didn't address that directly in

20    the report that I recall.  I may have, and I'm

21    looking here, but looking over the report, I

22    would say that he would have a very difficult

23    time in a normal work setting, just because of

24    problems with attention and concentration.

25    Also the emotional stability, depending on
```

1  where his treatment was right then, and how

2  successful he was responding to the medication

3  would also be a big variable, directly

4  affecting his ability to make it through a task

5  that was assigned to him.

6        Q.    Did you have information either

7  from the materials that were provided to you or

8  from the conversation you had with Mr. Cook as

9  to what his particular job was?

10        A.    I believe, from looking over one

11  of the prior files, he was a street sweeper.

12  Yes, that's what I wrote.  I summarized the

13  psych files provided to me, and I'm reading it

14  right here.

15        Q.    The bipolar disorder that you

16  diagnosed --

17            (A brief interruption was had.)

18            (A brief recess was had.)

19            (The record was read by the court

20             reporter.)

21        Q.    We got a cell phone call and took

22  a break.  I'm going to strike the beginning of

23  the last question and ask it again.  The

24  bipolar disorder that you diagnosed, do you

25  have an opinion, again based upon your training

1    and experience and education, as to the origin

2    of that condition?

3          A.    Yes.   Bipolar disorder is a

4    biological condition and we believe genetically

5    based.   In other words, you're pre-programmed

6    for it.   That's it in essence.

7          Q.    So that would be your opinion with

8    respect to Mr. Cook as well?

9          A.    Yes, it would be.

10         Q.    If I understand your testimony

11   then, it is your opinion that Mr. Cook's

12   bipolar disorder was not caused by his

13   employment?

14         MR. KELLY:   Objection.

15         A.    Do I answer?

16         Q.    Yes.

17         A.    That would be true, the bipolar

18   disorder was not caused by the incident.

19         Q.    And let me ask this same question

20   again.   These questions are to be answered to a

21   reasonable degree of psychological probability

22   based upon your education and training and

23   experience.   How about aggravation from work?

24   Would there be any aggravation of the bipolar

25   disorder?

1    A.    That is possible.  You can have an

2  exacerbation or an aggravation of a preexisting

3  condition.  To determine that, you really need

4  a baseline, which particularly in this kind of

5  a circumstance, is sometimes hard to piece

6  together just from the information provided by

7  the injured worker.

8    Q.    So you say that it's possible but

9  it's not your opinion that it's probable?

10    MR. KELLY:  Objection.

11    A.    I would have to take that on a

12  case by case basis.  That would be -- anything

13  can be exacerbated or aggravated; almost

14  anything.  It's just a question of then whether

15  that's clinically significant or whether that's

16  falling in a category of yes, it occured, but

17  it's not significantly changed the person in

18  their life with regard to their diagnosis.

19    Q.    Doctor, looking at the third page

20  of the exhibit, which is your report back to

21  the BWC, number five, you were, I believe,

22  asked about aggravation.

23    A.    Uh-huh.

24    Q.    Do you recall why you put "not

25  applicable"?

1          A.    Whenever I put that, it's because

2    to the best of my ability to determine in the

3    interview setting, I can't determine or can't

4    make the case for that, that's what occurred.

5    That there was an aggravation of something

6    preexisting.  Because that implies I would know

7    the prior level and now this level represents

8    something clinically significant above that,

9    based on the prior level.

10              MR. HILLER:  Doctor, I don't have

11   any other questions.  Thank you very much.

12              MR. MARTIN:  I don't have any

13   questions.  I'll pass the witness to whoever is

14   next.

15              MR. WILLIS:  I have no questions.

16                CROSS-EXAMINATION

17   BY MR. KELLY:

18          Q.    Dr. Oleski, I just wanted to ask

19   you a couple questions.  You stated that you

20   would need a baseline --

21          A.    Yes.

22          Q.    -- to determine if his condition

23   was exacerbated?

24          A.    Uh-huh, yes.

25          Q.    What factors would exacerbate a

| | |
|---|---|
| 1 | bipolar condition in a patient? |
| 2 | A. I'm pausing here for a minute |
| 3 | because this is a real hair splitter for me |
| 4 | from a diagnostical standpoint. The reason |
| 5 | being, you're talking about a condition that is |
| 6 | biologically based and which can be pretty |
| 7 | extreme in terms of forward expression of |
| 8 | behavior. People can do very dramatic things, |
| 9 | can present in a very histrionic manner, and it |
| 10 | would take something major enough that you |
| 11 | could take what might potentially be -- I can't |
| 12 | say that he could potentially be already an |
| 13 | elevated level and push that even higher to |
| 14 | some other level that would be deemed |
| 15 | clinically significant, and now we're getting |
| 16 | pretty subjective. Unless I say, well, the |
| 17 | person was controlled, or at least functional, |
| 18 | until they get to the point where they had an |
| 19 | exacerbation, and so whatever their background |
| 20 | symptomatology was -- for example, some people |
| 21 | experience a lot of sleeplessness, some people |
| 22 | are very irritable with this, some people are |
| 23 | just very eratic in their behavior, but then it |
| 24 | went to a new level where, for example, the |
| 25 | person was not functional. They were driving |