1    their car across people's lawns or digging up

2    plants, and these are the kinds of things that

3    some people have with bipolar disorders or

4    something like that.

5          Q.     In Mr. Cook's case, did you

6    discuss with Mr. Cook any of the occurrences

7    that he had with his employer at the City of

8    Norwood?

9          A.     To the best of my recollection

10   here, and I'm going back to something we were

11   reading just a few minutes ago, he volunteered

12   to me that -- and that's in the comments on

13   page two, fourth paragraph up from the bottom,

14   that he still had thoughts of going to City

15   Hall and blowing their brains out.  And so from

16   that, I took it that he was at odds with his

17   former employer, the City of Norwood.

18         Q.     Did you explore with him the

19   problems that he had with his employment at the

20   City of Norwood?

21         A.     I did explore that in a number of

22   issues.  One of the problems with Mr. Cook,

23   unfortunately, is that -- and I think this is

24   at the top of page three, when people are this

25   pressed and this distressed, or when they're

1    this distressed they become pressed in their

2    ability to focus on something.  It's hard to

3    keep someone focused for more than a few

4    seconds.  So it was just part of the interview

5    process that it was really very difficult to

6    get any kind of complete responses to any

7    number of questions.

8            Q.    In making the evaluation, which we

9    have marked as Defendant's Exhibit 1, that was

10   for the specific purpose of determining whether

11   the bipolar disorder was related to Mr. Cook's

12   neck injury; is that correct?

13           A.    Yes, sir.

14           Q.    And in going through Exhibit

15   Number 1, on page two of that document, you

16   reviewed Dr. George Parsons' psychological

17   evaluation of 11/17/1999; is that correct?

18           A.    Yes, it is.

19           Q.    And you did not find any problem

20   with his evaluation of Mr. Cook; is that

21   correct?

22           A.    That would not be correct.  I

23   don't find positively or negatively about the

24   files I review.  I just review them, put them

25   down, and then to whatever extent it may or may

1    not be something I want to delve back into, I

2    do that, but I just use them as background

3    information.

4         Q.   When you put down there, "The

5    findings of the files reviewed are accepted,"

6    what did you mean by that?

7         A.   Okay.  All that means is I

8    accepted the findings were done by another

9    licensed professional, and that was their

10   opinion at the time.  That doesn't mean that I

11   necessarily do or do not concur, and that's a

12   pretty standard thing that all of us put in

13   these IMEs.

14        Q.   Did you talk with Dr. David Helm

15   concerning Mr. Cook?

16        A.   No, I did not.

17        Q.   And just a couple more issues.

18   This examination that you did of Mr. Cook, how

19   long did that last?

20        A.   Probably about 40 minutes.

21        Q.   And what, if anything, would the

22   disclosure of medical records of a bipolar

23   patient, would that have any impact on his

24   bipolar condition?

25        A.    I want to make sure I'm

1    understanding you.  Would the revelation to the

2    injured worker that he was diagnosed as

3    bipolar?  Is that what you're saying?

4         Q.    No, the revelation by an employer

5    of a bipolar individual's medical records.

6    Would that have any impact on that individual?

7         A.    I'm not trying to be difficult, I

8    want to make sure I understand the question.

9    The employer is releasing information to the

10   injured worker?

11        Q.    No.

12        A.    I still don't understand.

13        Q.    Releasing it to his fellow

14   employees.

15        A.    Oh, to his fellow employees.

16             MR. HILLER:  Objection.

17             MR. MARTIN:  I also object.

18        A.    I'm really -- that's just very

19   difficult to come up with a response to.  I'd

20   almost have to be there or have people tell me

21   how he reacted, how he might have reacted.

22        Q.    And based upon your experience,

23   are there acts that people can commit that

24   would exacerbate a bipolar condition?

25        A.    Acts that others can commit upon

1    the bipolar patient?

2          Q.    Yes.

3          A.    I have to think about this for a

4    second.  I would have to say yes, and I would

5    say it would have to, again, be extreme enough

6    to take it from whatever level the person's at

7    to another level.  That it would be a

8    significant jump up.

9          Q.    And when you say it would have to

10   be severe enough, what type of acts would

11   exacerbate a bipolar condition?

12         A.    Okay.  I'm going to have to -- can

13   I expound a little bit here?

14         Q.    Certainly.

15         A.    Just because a person is bipolar

16   doesn't mean that they have the same kind of

17   personality.  That's a condition.  Just as

18   anyone can be depressed -- we could all have

19   very different personalities and obviously do,

20   we can still be depressed.  Bipolar disorder

21   people are not all possessed of the same

22   personality and that would seem to me to be

23   pretty important to know; that is the core

24   personality, for me to really answer that

25   accurately as to whether -- but I'll go this

1    far and say that, for example, if his family

2    was threatened or he felt that the safety of

3    his family or himself was threatened somehow,

4    something very extreme like that, a survival or

5    perceived survival, that might certainly be

6    enough to exacerbate someone who has a bipolar

7    condition.

8              Q.    So would a death threat to a

9    bipolar individual, is that one of the

10   conditions that could exacerbate his bipolar

11   condition?

12             A.    It could.

13                   MR. HILLER:   Objection.

14                   MR. MARTIN:   Note my objection

15   also.

16             Q.    And one of the other issues that I

17   wanted to discuss with you is this.   You stated

18   that you would need a baseline to determine if

19   his condition was exacerbated.

20             A.    Yes, sir.

21             Q.    And you didn't have that baseline;

22   is that correct?

23             A.    Didn't have it.   Unfortunately,

24   with bipolar disorder, it's a gray zone, if you

25   will.   Bipolar tends to manifest itself over

```
 1    some time.  It's not like the person wakes up
 2    one day and has the condition, and so it can be
 3    awfully difficult to establish a baseline even
 4    with a lot of information.  And that's just
 5    what makes this so much -- something that,
 6    clinically, what we do in this field is just
 7    try to treat it and manage it, because it is so
 8    difficult to establish that baseline.  Unless
 9    you have successful treatment that's ongoing
10    and then you've created a baseline which is
11    with successful treatment:  "Here's how the
12    person is."
13           Q.   When you interviewed Mr. Cook, did
14    you discuss with him his removal from his job
15    as street sweeper operator?
16           A.   I don't specifically recall that.
17    I see notes that tell me that I got his opinion
18    on that but I don't specifically recall asking
19    him that, no, sir.
20           Q.   Did you have any discussion with
21    Mr. Cook concerning his inability to return to
22    work when the City of Norwood stated it had no
23    light duty work available but permitted younger
24    workers to perform light duty work?
25               MR. HILLER:  Objection.
```

```
 1              MR. MARTIN:  Objection.
 2         A.    I don't have, again, a specific
 3    recollection.  That kind of question tends to
 4    come up pretty routinely in these kind of
 5    evaluations and there is often that frustration
 6    noted, but I don't have specifically a
 7    recollection of that.  No, sir.
 8         Q.    And did you have any discussion
 9    with Mr. Cook that the City of Norwood
10    suspended him over, among other things, his
11    filing of an EEOC charge concerning age
12    discrimination involving the City of Norwood?
13              MR. MARTIN:  Objection.
14              MR. HILLER:  Objection.
15         A.    I have no recollection of that at
16    this point, about two and a half years ago.
17         Q.    Now, the last sentence of your
18    report states, "Hopefully, the injured worker
19    will follow through with his treatment plan for
20    this serious psychological condition."  Do you
21    see that?
22         A.    Yes, sir.
23         Q.    Now as you're sitting here today,
24    do you know when the onset date was of that
25    serious psychological condition?
```

```
 1            A.    Offhand, I do not.

 2            Q.    And the serious psychological

 3     condition that we're talking about is his

 4     bipolar condition.

 5            A.    Yes, sir, it is.

 6            Q.    And going to the second page of

 7     your report, when asked to describe his own

 8     psychological status, Mr. Cook stated, "Still

 9     have thoughts of going to City Hall and blowing

10     their brains out."  Did you explore that issue

11     with him concerning his basis for that

12     statement?

13            A.    Yes, I did.

14            Q.    And did he explain to you why he

15     felt that way?

16            A.    What I recall is he gave me a lot

17     of narrative and from that narrative I pieced

18     together my conclusions.  That was the basis

19     for my impressions which led to my conclusions.

20     He was so scattered that it wasn't like I could

21     ask him a question, then he would just say

22     number one, two, three and four.  So yes, I did

23     talk with him about that, and I talked about it

24     in my impressions and conclusions.

25            Q.    Does a bipolar condition always
```

1  result in disability, Dr. Oleski?

2        A.   It does not have to, no, sir.

3        Q.   Are there individuals who have

4  bipolar disorder who are able to function and

5  go to work?

6        A.   Yes, there are.

7        Q.   When you spoke with Mr. Cook, were

8  you aware that he had been employed by the City

9  of Norwood for approximately 25 years?

10       A.   I knew that he had been employed

11  by the City of Norwood.  Just to be accurate,

12  I'm not -- I mean, I don't have specific

13  recollection that it was 25 years.  I know it

14  was lengthy.

15       Q.   And did you become involved in any

16  discussion with Mr. Cook concerning his

17  treatment by his employer, the City of Norwood?

18       A.   Again, I think I touched upon this

19  a little bit a few minutes ago.  It's pretty

20  common for people to ventilate, and upon doing

21  the evaluation I give them that time to

22  ventilate their feelings, whatever it might be

23  most pressing in their lives, and very often

24  it's their relationship with their employer.

25  And I obviously did that because I have at

1    least one quote here where he expressed some

2    real concern about them and some negative

3    feelings, so I would say yes.

4         Q.    But you didn't determine the

5    veracity of these allegations made by him; is

6    that correct?

7         A.    That is correct.

8         Q.    And did you have any discussion

9    with Mr. Cook concerning any actions taken at

10   his place of employment by an individual by the

11   name of Gary Hubbard?

12              MR. MARTIN:  To which I object.

13        A.    Again, I just don't have

14   recollection.  I may have, I may not have.

15   It's been two and a half years at this point.

16        Q.    Were you aware that Dr. Helm has

17   been treating Mr. Cook for his bipolar

18   condition at the time that you did your report?

19        A.    I believe I was aware of that,

20   because I had Dr. Helm's report and I did

21   reference that I was hoping that he would stay

22   with his treatment plan.  So I make that

23   connection and say, yes, I believe I was.

24        Q.    And did you discuss with Mr. Cook

25   his treatment plan with Dr. Helm?

1       A.   I believe that, if it was none

2   standard, I would have put something down.   I

3   believe it was the usual combination of

4   medications, whether it's lithium carbinate or

5   Depakote or whatever else they might have used,

6   and psychotherapy of some kind to manage.   That

7   would be my best guess.   Something of a guess,

8   but I wouldn't have made this commentary

9   without discussing something like that with

10  him.

11      Q.   Were you able to determine during

12  the course of your evaluation how Mr. Cook

13  injured his neck?

14      A.   I accepted the findings here that

15  his neck was hurt and apparently there was an

16  allowance for that.   I usually do.   I don't

17  have specific notes here to that effect so I'm

18  going to say I don't have any recollection of

19  that.

20      Q.   Did Mr. Cook mention at any time

21  during the course of your evaluation that

22  equipment that he operated within the City of

23  Norwood was disabled by his supervisors?

24          MR. MARTIN:   To which I object.

25          MR. HILLER:   Objection.

```
 1           A.   He may have.  I have no

 2   recollection of that.

 3           Q.   Assuming Mr. Cook is employed by

 4   the City of Norwood as a street sweeper

 5   operator, and that his supervisors at the City

 6   of Norwood go down to the lead mechanic of

 7   Norwood Public Works and instruct that mechanic

 8   to disable the street sweeper, to force

 9   Mr. Cook to run a jackhammer, would that affect

10   his bipolar disorder?

11                MR. MARTIN:  Objection.

12                MR. HILLER:  Objection.

13                MR. WILLIS:  Objection.

14           A.   In that theoretical circumstance,

15   it may, but again, I'd have to review that on a

16   case by case basis and I need more information.

17                MR. HILLER:  Move to strike.

18           Q.   Were you able to determine if

19   Mr. Cook was a religious individual,

20   Dr. Oleski?

21           A.   I have no recollection of that

22   whatsoever, so I would say no.

23                MR. KELLY:  I'm done.  Thank you,

24   Doctor.

25
```

```
 1              RECROSS-EXAMINATION
 2   BY MR. HILLER:
 3         Q.   Briefly, Doctor, if I understand
 4   your testimony correctly, you're not giving a
 5   professional opinion that Mr. Cook's bipolar
 6   disorder was aggravated or exacerbated by his
 7   employment or any other employees?
 8              MR. KELLY:  Objection.
 9         A.   That is correct.
10         Q.   And I recall that you apparently
11   were not specifically asked by BWC to render an
12   opinion as to whether Mr. Cook was disabled at
13   the time that you saw him, but can you, upon
14   review of your report, and again upon the basis
15   of your education and training and perhaps your
16   recollection as you sit here of your interview
17   and observations of Mr. Cook, are you able to
18   express an opinion to a reasonable degree of
19   psychological certainty as to whether he would
20   have been disabled from his job as a street
21   sweeper as of the date of your interview?
22         A.   As of the date of the interview?
23         Q.   Yes.
24         A.   That's difficult.  The best I can
25   come up with is that during that interview he
```

1    was very distressed and that his distress was

2    such that, if I have to go one way or the

3    other, I would probably say he would have had a

4    difficult time working and, therefore, could

5    have been characterized as at least partially

6    disabled by dint of his cognitive difficulties

7    and emotional difficulties.

8                MR. KELLY:  Objection, move to

9    strike.

10        Q.    Would you be able to say that his

11   inability to work or his disability would be to

12   a probable degree?

13        A.    Again, this is tough, it's been

14   two and a half years, but going from my notes,

15   I would say it would be to a probable degree.

16   He was very distressed.

17                MR. HILLER:  I have no other

18   questions.  Thank you.

19                MR. MARTIN:  No questions.

20                MR. KELLY:  Doctor, I just have a

21   couple questions for you.

22                RECROSS-EXAMINATION

23   BY MR. KELLY:

24        Q.    One is, your entire evaluation of

25   this gentleman consisted of approximately 40

1      minutes; is that correct?

2                A.    Yes, it is.

3                Q.    And as you're sitting here today,

4      you really can't state whether his bipolar

5      condition was aggravated by other employees at

6      Norwood Public Works because you don't have the

7      information to make that determination; is that

8      correct?

9                A.    That would be correct.

10               Q.    And you don't have the information

11     in your possession whether his superiors at

12     Norwood Public Works -- and by superior I mean

13     his supervisors -- aggravated his bipolar

14     condition because you don't have the baseline

15     to determine that.  Is that correct?

16               A.    That would be correct also.

17               MR. MARTIN:  Objection.

18               Q.    And you didn't take any of this

19     information concerning any aggravation of his

20     bipolar condition at the time that you did your

21     evaluation because your evaluation was limited

22     to whether his bipolar condition was connected

23     to his neck injury.  Is that correct?

24               A.    Best of my recollection, that is

25     correct.

1          Q.    And if you were requested to

2   determine whether Mr. Cook's bipolar condition

3   was aggravated or exacerbated by his employment

4   within the City of Norwood, what if any

5   information would you require to make that

6   determination?

7          A.    First thing I'd have to say would

8   be it sounds as though you're asking me to make

9   that determination as of when I did the

10  evaluation which was, again, two and a half

11  years ago, so I'm not -- that would be pretty

12  difficult without very sensitive information,

13  because I'd be recreating, again, a set of

14  circumstances, personality circumstances, et

15  cetera, from -- this is October of 2000?  That

16  would be awfully difficult to do.  I mean, all

17  sorts of medical records and reports, and I

18  could analyze it as best I could, but there's

19  just some severe limiting factors in even

20  attempting to do that.

21         Q.    And what would those limiting

22  factors be?

23         A.    That I'm trying to go back in time

24  with someone who -- go back in time two and a

25  half years and determine where this gentleman

1    was emotionally, vis-a-vis his work

2    circumstance, and the variables that you're

3    talking about here.

4         Q.    Would his treating psychiatrist

5    who was treating him through that period of

6    time have information in his possession which

7    could assist you in making that determination?

8         A.    It's possible.  He would sound

9    like at least a much more comprehensive -- a

10   potentially much more comprehensive source of

11   information.  Since I did an evaluation of this

12   gentleman -- are you referring to Dr. Helm?

13        Q.    Yes.

14        A.    Would have been the one presumably

15   with office notes and a history with him.  Yes.

16        Q.    And having that continuity of

17   relationship with Mr. Cook would permit a

18   health care professional to make a

19   determination whether his bipolar condition was

20   exacerbated or aggravated by conditions of his

21   employment; is that correct?

22        A.    Potentially, it would.  I don't

23   want to speak for Dr. Helm --

24        Q.    I understand.

25        A.    -- but from my standpoint, it

1    would make him certainly a better informed

2    assesser of that.

3                    MR. KELLY:  I have nothing

4    further.

5                    MR. HILLER:  Nothing further.

6                    MR. MARTIN:  No questions.  Thank

7    you doctor.

8

9

                       _____
10                     MERRITT OLESKI, Ph.D.
           (DEPOSITION CONCLUDED AT 10:55 A.M.)
11                         -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                C E R T I F I C A T E
        STATE   OF   OHIO   :
 2                         :  SS
        COUNTY OF HAMILTON :
 3              I, Darlene Anthony, RPR, the under-

 4      signed, a duly qualified notary public within

 5      and for the State of Ohio, do hereby certify

 6      that MERRITT OLESKI, Ph.D. was first duly sworn

 7      to depose the truth, the whole truth, and

 8      nothing but the truth; the foregoing is the

 9      deposition given at said time and place by said

10      witness; that said deposition was taken

11      pursuant to stipulations hereinbefore set forth;

12      that said deposition was taken by me in stenotypy

13      and transcribed by means of computer; that said

14      deposition was submitted to the witness for

15      examination and signature; that I am neither a

16      relative of any of the parties or any of their

17      counsel; and I am not, nor is the court

18      reporting firm with which I am affiliated,

19      under a contract as defined in Civil Rule

20      28(D), and have no interest in the result of

21      this action.

22              IN WITNESS WHEREOF, I hereunto set my
        hand and official seal of office at Cincinnati,
23      Ohio, this 14th day of Ap    Darlene Anthony

24      My Commission expires: Darlene Anthony
        May 10, 2006            Notary Public-State of Ohio
25
```

*LITIGATION SUPPORT SERVICES, INC.*
*CINCINNATI (513) 241-5605  DAYTON (937) 224-1990*